**Stacey LEAKE, by her mother, Mitzi L. SHREVE, and Mitzi L. Shreve, Plaintiffs,**

v.

**BERKELEY COUNTY BOARD OF EDUCATION and James Bennett, Superintendent, Defendants.**

**Civil Action No. 3:95–CV–1.**

United States District Court, N.D. West Virginia.

Feb. 27, 1997.

Nancy A. Dalby, Hamstead & Associates, Charles Town, WV, Braun A. Hamstead, Hamstead & Assoc., Charles Town, WV, for Plaintiffs.

Claudia W. Bentley, Kimberly S. Croyle, Bowles, Rice, McDavid, Graff & Love, Martinsburg, WV, for Defendants.

## MEMORANDUM OPINION AND ORDER

BROADWATER, District Judge.

This is a declaratory judgment action arising under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* (1990 & Supp.1996). The matter is currently pending before this Court pursuant to the parties' respective motions for summary judgment on several separate issues. For the reasons set forth below, the defendants' motion for summary judgment is granted, on statute of limitations grounds, as to the plaintiffs' claim for special education services between 1986 and 1993. All other issues raised in the cross-motions for summary judgment are held in abeyance and will be ruled upon later by separate memorandum and order.

## I. *Procedural History*

The plaintiffs, Stacey Leake and her mother, Mitzi L. Shreve, filed their first complaint against the defendants, the Berkeley County Board of Education and James Bennett, Superintendent, on January 5, 1995. This complaint challenged the Amended Order that Due Process Hearing Officer Barbara Reed issued on September 9, 1994. The Amended Order dismissed Ms. Shreve's request for a full IDEA Due Process Hearing regarding Stacey Leake's eligibility for special education services on the grounds that Berkeley County Schools had, subsequent to this request, declared her to be eligible. In their initial complaint, the plaintiffs asked the Court to reverse "the decision of the Hearing Officer in the first due process proceeding, so that Stacey cannot be denied any benefits or rights to which she was otherwise entitled, by reason of such dismissal" and to award attorney fees and costs.

The plaintiffs filed their second complaint, against the same defendants, on March 3, 1995. This complaint challenged the January 31, 1995 Decision of IDEA Due Process Hearing Officer Patrick S. Casey. In this Decision, Casey found the plaintiffs' claims for special education benefits from 1986 to 1993 to be time-barred and held that Stacey Leake's September 8, 1994 Individualized Education Plan (IEP) was reasonably calculated to confer educational benefit and was being properly implemented. He ruled, moreover, that the school board's failure to find Stacey Leake eligible for special education in February 1994 should be addressed via an appeal of Hearing Officer Reed's earlier decision. In the second complaint, plaintiffs sought a reversal of Casey's January 31,

1995 Decision and a declaration that the defendants had both violated IDEA procedures and denied Stacey Leake a free appropriate education. Additionally, plaintiffs asked the Court to compel the defendants to implement an appropriate IEP and to reimburse their attorney fees and costs.

In April 1995, the initial presiding United States District Judge, the Honorable Irene M. Keeley, granted the plaintiffs' motion to consolidate both cases. Judge Keeley also entered an Order, dated April 10, 1996, that granted-in-part and denied-in-part the plaintiffs' motion to admit additional evidence. Judge Keeley's ruling authorized the admission of an August 24, 1994 draft IEP and permitted, as relevant to the question of whether Stacey Leake was receiving educational benefit from her IEP, the introduction of "current, post hearing standardized test results . . ." This Order further required the parties "to submit cross motions for summary judgment on the due process issues . . ."

By Order entered on June 4, 1996, Judge Keeley transferred the case to United States District Judge Frederick P. Stamp. Before a decision was reached on the parties' respective motions for summary judgment, Judge Stamp entered an Order, dated September 3, 1996, which transferred the matter to this Court's docket. On October 16, 1996, the parties appeared by their counsel of record before the Court for a status conference. At this time, the Court discussed and reviewed with both parties' counsel all pending motions and the issues to be resolved on summary judgment.

## II. Issues Presented

The defendants framed three issues to be decided by the Court in their motion for summary judgment and memorandum of law. These three issues are as follows: (1) whether the first Due Process Hearing Officer properly dismissed the plaintiffs' petition as moot because the remedy they sought, a determination of eligibility, had been granted subsequent to the hearing request; (2) whether the second Due Process Hearing Officer properly concluded that the plaintiffs' claims for special education services between 1986 and 1993 were time-barred; and (3)

whether the second Due Process Hearing Officer correctly determined that the September 8, 1994 IEP was appropriate and properly implemented based upon the evidence offered. While counsel for the plaintiffs did not specifically enumerate the issues in this manner, they have, at pages fifteen and sixteen of their motion for summary judgment, indicated their general agreement with the defendants' presentation of the questions in dispute. As stated previously, in light of the complex nature of both the present matter's procedural history and the questions presented on summary judgment, this memorandum will only address the second issue—the propriety of the second Hearing Officer's statute of limitations determination—listed above.

## III. Uncontested Material Facts

The first Due Process Hearing was occasioned by the plaintiffs' actions in the fall of 1993. In October 1993, Ms. Shreve took her daughter to Brook Lane Psychiatric Center in Hagerstown, Maryland for outpatient evaluation and psychological testing. After administering intelligence and achievement tests, the Center diagnosed Stacey as suffering from both Attention Deficit Hyperactivity Disorder (ADD) and Severe Learning Disability (LD) and recommended temporary out-of-school instruction. Ms. Shreve subsequently took the Center's findings to Stephen Snyder, then Director of Special Education for Berkeley County. Snyder informed Ms. Shreve that her daughter would not, under the West Virginia Department of Education's Policy 2419: *Regulations for the Education of Exceptional Students* (hereinafter "Policy 2419"), qualify for special education services on the basis of the Center's independent evaluation. Accordingly, Snyder arranged for a county psychologist to administer further testing. Ms. Shreve gave the consent necessary for this additional screening and evaluation on November 22, 1993.

Hope Reagan, the assigned county psychologist, met with Ms. Shreve and Stacey in December 1993. After the latter indicated that she felt uncomfortable with Ms. Reagan, Snyder referred the matter to Hal Slaughter, a psychologist engaged in private practice in Berkeley County. Slaughter conducted test-

ing in January 1994 and recommended afterwards, *inter alia*, that Stacey continue to receive medication for ADD and that she be placed in "lower level classes" as soon as possible.

The IEP Committee informed Ms. Shreve, in a letter dated February 15, 1994, that it would meet in order to determine Stacey's eligibility and if necessary, to develop an IEP and recommend placement. The IEP Committee convened on February 28, 1994. At the conclusion of this meeting, which Ms. Shreve attended, the IEP Committee found that Stacey was not eligible for special education services, noted her ADD diagnosis, and referred her to a Section 504 Committee. Ms. Shreve disagreed with the IEP Committee's eligibility determination and expressly declined to give approval to its proposed educational placement.

Ms. Shreve voiced her disagreement with the IEP Committee's finding by sending a letter, dated February 28, 1994, to Superintendent Bennett and the West Virginia Department of Education. In this letter, Ms. Shreve complained about the IEP Committee's February 1994 decision and, for the first time, expressed concern over the fact that Stacey had not received special education services beginning in 1986.[1] Additionally, Ms. Shreve, on or about March 9, 1994,

filed a letter of complaint with the West Virginia Department of Education, Office of Special Education Programs and Assurances (OSEPA). Ruth Lilly, an OSEPA official, summarized Ms. Shreve's allegations in a March 21, 1994 letter to Stephen Snyder. In this letter, Lilly noted that Ms. Shreve had alleged that:

1) Berkeley County Schools has (sic) failed to conduct a complete multi-disciplinary evaluation for the student. Specifically, the evaluation conducted in November 1993 consisted solely of a psychological evaluation.

2) Berkeley County Schools failed to convene an Eligibility Committee on February 28, 1994 with the appropriate membership.

3) Berkeley County Schools failed to conduct the multidisciplinary evaluation within the appropriate timelines.

4) Berkeley County School has failed to provide special education services to the student as identified in 1986.

By letter dated March 21, 1994, Ms. Shreve also requested a Due Process Hearing with regard to the IEP Committee's February 28, 1994 eligibility determination. In February and April 1994 letters, she further requested that another IEP Committee convene in order to reconsider Stacey's eligibility. Ms. Shreve did not mention or object to

---

1. In May 1986, Ms. Shreve gave Berkeley County permission to conduct testing in order to determine if Stacey's "educational needs [were] being met." Thereafter, a school psychologist, Charles Jennings, prepared a report containing a psychological assessment of Stacey. In this report, dated October 14, 1986, Jennings noted the discrepancy between Stacey's verbal ability and her achievement in the area of simple arithmetic calculation. He opined that this discrepancy was related to her "attention and conceptualization deficits." On October 13, 1986, Jennings issued a Learning Disabilities/Behavior Disorders Multidisciplinary Team Evaluation Report. This evaluation, citing several test results, specifically concluded that Stacey had a specific learning disability.

In November 1986, a Placement Advisory Committee (hereinafter "PAC") convened for the purpose of both reviewing the multidisciplinary team results and making a placement recommendation. After this meeting, the PAC issued a written Educational Plan, dated November 12, 1986, in which it recommended that Stacey

"[c]ontinue regular class" and announced that it would meet again at the end of that semester. Ms. Shreve gave written approval to the PAC's proposed plan on that day. Nevertheless, this second meeting inexplicably never took place.

On December 9, 1987, an LD resource teacher conducted a classroom observation of Stacey and concluded that she was a possible candidate for learning disabled instruction. Later that month, Stacey's regular classroom teacher noted, in a student evaluation report, that she showed a "[l]ack of attention and weakness in remembering math facts and concepts." Stacey was not, however, offered special education services at this time. Except possibly for the 1990–1991 academic year, she thereafter received regular education. While a regular education student, Stacey received consistently poor grades, developed an absenteeism problem, and exhibited socially delinquent behavior. After the PAC's denial of special education services in November 1986, Ms. Shreve took no action concerning Stacey's eligibility until the fall of 1993.

any of the 1986–1987 events in any of these letters.

On April 29, 1994, OSEPA responded to Ms. Shreve's complaint. As to Ms. Shreve's first three allegations, it concluded that Berkeley County had indeed violated Policy 2419's requirements regarding the adequacy and timeliness of the multidisciplinary evaluation and the composition of the IEP Committee. On the issue of Stacey's eligibility in 1986, however, it found no violation. OSEPA ordered the County to take various corrective measures in response to the above-referenced violations and informed both parties of their rights to appeal its determination. Ms. Shreve took no further legal action on this determination.

Subsequent to the issuance of OSEPA's findings, Stacey was subjected to additional observation, evaluation and testing. On June 1, 1994, the IEP Committee met and determined that she was eligible for special education services. Thereafter, the Committee went about developing an IEP for her. It convened on both August 5, 1994 and August 24, 1994 for this purpose. On August 24, 1994, Hearing Officer Barbara Reed dismissed the Due Process proceeding (Due Process 94–039) that Ms. Shreve had initiated in response to the IEP Committee's February 28, 1994 non-eligibility determination. In a one page Order, amended on September 9, 1994, Reed reasoned that the matter had been rendered moot since: 1) Stacey had subsequently been found eligible for special education services, 2) an IEP had been signed and 3) there were no other issues before her.[2] The Committee finalized Stacey's IEP, and Ms. Shreve gave it written approval, on September 8, 1994. The IEP provided, *inter alia,* that Stacey would receive regular education on a part-time basis as well as vocational training.

On or about October 1, 1994, Ms. Shreve, in a letter to the West Virginia Department of Education, asked for another Due Process Hearing (Due Process 95–012). In this second Due Process proceeding, she alleged that: 1) the school board improperly found

Stacey Leake ineligible for special education in 1986 and failed to refer her for re-evaluation in subsequent years; 2) that the school board improperly found Stacey Leake ineligible in February 1994; and 3) that the September 8, 1994 IEP was inappropriate and was not being implemented properly.

Hearing Officer Patrick Casey conducted a hearing on these allegations on November 28 and 29, 1994. During this hearing, attorneys for both Ms. Shreve and Stacey Leake and the School Board presented witnesses and introduced documentary evidence. Thereafter, Casey issued a ruling in the latter's favor. As indicated above, in a Decision of Due Process, dated January 31, 1995, Casey held that the claim regarding the Board's failure to find Stacey Leake eligible for special education services between 1986 and 1993 was time barred. In addition, he declined to pass on the validity of the Board's February 1994 non-eligibility determination and instead ruled that this question should be resolved through an appeal of Due Process 94–039's dismissal. Finally, Casey found both that the September 1994 was appropriate as written and that it was being properly implemented. As set forth in Part I of this opinion, plaintiffs filed complaints on January 5, 1995 and March 3, 1995 which respectively appealed the rulings in Due Process 94–039 and Due Process 95–012.

## IV. *Discussion*

In their October 1994 request for a second Due Process Hearing, Mr. and Ms. Shreve insisted that Stacey Leake was entitled to eight years of compensatory education because the PAC improperly failed to find her eligible for special services in 1986. Hearing Officer Casey, in his January 1995 Decision, specifically concluded that the "allegations concerning the school board's failure to find the student eligible for special education from the Fall of the (sic) 1986 to the Fall of the (sic) 1993 are time barred." In so holding, he found that:

> There are no codified standards that dictate when a due process complaint must be

---

2. The Amended Order simply omitted an extraneous sentence inadvertently included in the original Order.

filed concerning a particular act or omission of a school board; however, some time standards have evolved as to when an appeal or civil action must be filed once a due process action has been decided. A great disparity exists among the courts that have decided the issue. Some courts apply a standard personal injury analysis while others apply a stricter and shorter administrative standard. (citation omitted). Under any analysis, the the (sic) time period for the filing of an appeal or a civil action in any jurisdiction does not exceed four years.

In the present case, the request for due process was not received by the State Department of Education until October 7, 1994, which is approximately eight years after the initial determination of non-eligibility in 1986. By analogy, the filing of a due process proceeding some eight years after the offending action would be barred under any analysis. Also, because of a lack of information, evidence and explanations as to why the student was found to be ineligible and why she was not referred again for evaluation, any decisions as to its appropriateness would be speculative, at best.

While the above analysis requires some clarification, the conclusion reached thereby— that the compensatory education claim was untimely—withstands scrutiny.

■ 20 U.S.C. § 1415(b)(2) (hereinafter "§ 1415(b)(2)"), the IDEA provision pursuant to which a party may request a Due Process Hearing, makes no mention of a statute of limitations. When a federal court confronts a federal statute that does not contain a limitations period, it must "borrow a period from state law which governs an analogous cause of action." *Thomas v. Staats*, 633 F.Supp. 797, 799 (S.D.W.Va.1985) (citations omitted) (borrowing West Virginia's 120–day period governing applications for certiorari review of state administrative actions and applying it to actions seeking federal review

of Due Process decisions under 20 U.S.C. § 1415(e)(2)). As a consequence, the limitations period for a federal statute silent on this issue will vary from state to state. *See id.* at 800.

No court has expressly addressed the question of what time limitation should govern when a party, pursuing a claim for compensatory education, files a § 1415(b)(2) Due Process request in West Virginia. Nevertheless, the First Circuit, in *Murphy v. Timberlane Regional School Dist.*, 22 F.3d 1186 (1994), decided this issue as it applies in New Hampshire. This Court finds this decision dispositive of the limitations question at issue here. Accordingly, the Court will briefly summarize *Murphy* and then apply the "borrowing" methodology outlined therein to the present matter.

A. The *Murphy* Overview [3]

Kevin Murphy, the student-petitioner in *Murphy v. Timberlane Regional School Dist.*, was, at an early age, deemed a disabled individual entitled to special education services under the IDEA. *Murphy III*, 22 F.3d at 1187. During the 1981 school year, Murphy participated in a special education program at an elementary school. *Id.* at 1188. In December 1981, he suffered a seizure at home and was kept out of school, at the election of his parents, for approximately two years. *Id.* In January 1984, Murphy returned to school and remained enrolled through the 1988–1989 school year. *Id.* In July 1989, shortly after Murphy's twenty-first birthday, a school official notified the Murphys that their son would be discharged as a special education student. *Id.*

In August 1989, Murphy's parents requested an administrative hearing in which they argued that he was entitled to compensatory educational services for the period between January 1982 and January 1984 in which he received no educational services. *Id.* The hearing officer eventually determined that

---

**3.** *Murphy v. Timberlane Regional School Dist.* involves three reported decisions appearing under the same name. As set forth below, the Court will refer to these decisions as follows: *Murphy I*, 973 F.2d 13 (1st Cir.1992) (vacating district court's ruling that student's compensato-

ry education claim was barred by laches); *Murphy II*, 819 F.Supp. 1127 (D.N.H.1993) (granting, after remand, summary judgment in favor of student); *Murphy III*, 22 F.3d 1186 (1st Cir. 1994) (affirming district court's ruling on appeal).

the compensatory education claim was barred by laches, and the United States District Court for the District of New Hampshire affirmed this decision. *Id.* On appeal, the First Circuit vacated the district court's decision and remanded for additional findings relating to the laches defense. *Id.* (citing *Murphy I,* 973 F.2d at 18). On remand, the school district moved for summary judgment based on both laches and statute of limitations defenses. *Id.* at 1188–89 (citing *Murphy II,* 819 F.Supp. 1127). The district court rejected the laches claim on the merits. *Id.* at 1189 (citing *Murphy II,* 819 F.Supp. at 1133). It denied the statute of limitations argument by holding "that laches alone could provide a temporal limitation on the Murphys' compensatory education claim." *Id.* at 1190 (citing *Murphy II,* 819 F.Supp. at 1132).

Thereafter, the school district sought review of the district court order. On appeal, the First Circuit held that neither laches nor the statute of limitations barred the Murphy claim. With regard to the statute of limitations, the court declined to hold, like the district court, that this defense was unavailable to the school district. *Id.* at 1190. Instead, the First Circuit conducted a borrowing analysis and concluded that New Hampshire's six year limitation applicable to personal actions governed the Murphy claim. *Id.* at 1190–94. It then found that the claim was not untimely under this provision. *Id.* at 1194–95.

In its decision, the First Circuit asserted that a court employing the "borrowing" methodology may " 'adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so.' " *Id.* at 1190 (citations omitted). It noted, moreover, that the borrowing court, in selecting a state limitation, must "balance both the interests of the parties and the legislative goals of the particular federal statute." *Id.* (citation omitted). Finally, the court observed that:

> [T]he nature of actions that can be brought under the [IDEA] as well as the Act's goal of proper education of the handicapped child make the selection of state limitations periods on a case-by-case basis an imperative. The individual case must be characterized by considering the facts, the circumstances, the posture of the case and the legal theories presented.

*Id.* (citation omitted).

Applying these principles, the First Circuit found that, as between New Hampshire's four-year statute governing " 'Actions to Recover For Bodily Injury' against local governmental units," and its six-year statute for "personal actions," the latter provided the more appropriate limitation period. In so holding, the court first examined the nature of the Murphy claim. *Id.* at 1190. In particular, it noted that the Murphy matter, in contrast to the typical IDEA case:

> does not concern the appropriate limitation to be applied to an appeal from a state administrative ruling to a federal district court under 20 U.S.C. § 1415(e)(2), but to the initiation of a request for an 'impartial due process' administrative hearing under 20 U.S.C. § 1415(b)(2) *in the first instance* (emphasis in original).

*Id.* at 1191. As a consequence, the court underscored the fact that the school district's successful interposition of a limitations defense would not simply preclude a judicial "second look" at the Murphys' compensatory education claim, but would foreclose altogether any ruling on this issue. *Id.* at 1192.

Next, the First Circuit analyzed the two limitations statutes vis a vis the relief that the Murphys sought. *Id.* In this regard, it held that the four-year statute, designed by the legislature " 'to limit municipal liability arising from tort suits and related personal property claims,' " did not meet the threshold "like action" test. *Id.* In contrast, the court found the six-year "catch-all" provision, which functioned "as a 'backstop' limitation on civil actions not governed by some more particular limitation," to be an appropriate candidate for application to the Murphys' compensatory education claim. *Id.* at 1192–93.

Finally, the court considered whether application of the six-year limitation period would comport "with the purposes underlying the IDEA and the New Hampshire implementing regulation." *Id.* at 1193. With respect to this issue, the court observed that the IDEA, which functions to secure special

educational entitlements for eligible individuals, embodies a preference "for educational decisions arrived at through 'good-faith cooperation and negotiation among the parties.'" *Id.* at 1193–94 (citation omitted). It then found that use of the six-year limitation, as opposed to a more abbreviated period, promoted this goal by giving the parties substantial time to resolve their differences before resorting to litigation. *See id.* at 1194.

## B. Application of *Murphy*

■ Under *Murphy,* a borrowing court must first consider the nature of the claim that is subject to the time limitation challenge. 22 F.3d at 1190. On this issue, the Court notes that the present matter, like *Murphy,* does not involve the question of what limitation period should govern a § 1415(e)(2) appeal from a Due Process ruling, but rather concerns the appropriate limitation to apply to a party's initial request for an administrative hearing under § 1415(b)(2). As in *Murphy,* therefore, the limitation the Court borrows here will determine not simply whether a compensatory education claim is reviewed on appeal, but, more fundamentally, whether this claim is ever heard in the first instance.[4]

■ In light of the foregoing consideration, the Court finds that two separate limitation periods, both found in the West Virginia statute applicable to "Personal actions not otherwise provided for," W.Va.Code § 55–2–12 (1994), could govern the Leake § 1415(b)(2) request. These two provisions, §§ 55–2–12(b) & (c), state that:

> Every personal action for which no limitation is otherwise prescribed shall be brought:
> .... (b) within two years next after the right to bring the same shall have accrued if it be for damages for personal injuries; and (c) within one year next after the right to bring the same shall have accrued if it be for any other matter of such nature that, in case a party die, it could not have been brought at common law by or against his personal representative.

As between the two, § 55–2–12(c) is the more attractive candidate under the *Murphy* "like action" inquiry. By its plain language, § 55–2–12(c) governs personal actions, other than those for damage to property and for personal injuries, which do not survive at common law. *Snodgrass v. Sisson's Mobile Home Sales, Inc.,* 161 W.Va. 588, 244 S.E.2d 321, 324 (1978). *See also, Funeral Services by Gregory, Inc. v. Bluefield Community Hospital,* 186 W.Va. 424, 413 S.E.2d 79, 84 (1991) (describing § 55–2–12(c) as applicable to civil actions, such as libel, defamation and false arrest, which do not survive the death of the party), *overruled on other grounds by Courtney v. Courtney,* 190 W.Va. 126, 437 S.E.2d 436 (1993). Accordingly, this provision would seem to readily apply here since Stacey Leake's claim for compensatory education would not survive her death.

Nevertheless, the Court must also consider the policies served by the federal statute in question when it conducts the borrowing analysis. *See Murphy III,* 22 F.3d at 1193. In this regard, it is well settled that the IDEA functions "'to protect the educational rights of the handicapped student and to maintain the involvement of that child's parents in the education choices for their child.'" *Oak Park and River Forest High School Dist. No. 200 v. State Bd. of Educ.,* 886 F.Supp. 1417, 1423 (N.D.Ill.1995) (citation omitted), *rev'd on other grounds,* 79 F.3d 654 (7th Cir.1996). As noted above, the borrowing decision made today will determine whether a student will have the initial opportunity to be heard on her claim that she was wrongfully denied otherwise irretrievable special education services. In light of this significant interest, and the goal of the IDEA, the Court is convinced that a one-year limitation is simply too short and that § 55–2–12(c) is, therefore, inapplicable.

The Court finds the application of § 55–2–12(b) less problematical. First, while the Court does not view the present matter as a personal injury case, the Leake compensatory education claim can be fairly characterized as a "personal action." Other courts, more-

---

**4.** Accordingly, *Thomas v. Staats, supra* p. 845, which addressed the appropriate West Virginia limitation to be applied to a § 1415(e)(2) appeal,

is neither relevant to, nor controls, the disposition of the present matter.

846

over, have analogized IDEA claims to personal injury actions in the statute of limitations borrowing context. *See e.g., Oak Park School Dist. v. State Bd. of Educ.*, 886 F.Supp. at 1423 (applying Illinois' two-year general personal injury statute where student challenged, under § 1415(b)(2), the propriety of services received); *K.P. v. Juzwic*, 891 F.Supp. 703, 716–17 (D.Conn.1995) (finding student's request for a Due Process Hearing on a compensatory education claim to be timely under Connecticut's three-year personal injury statute). As a consequence, § 55–2–12(b) passes muster under the "like action" test.

In addition, § 55–2–12(b) is consistent with the interests that the IDEA promotes. As the court in *Oak Park* observed, the IDEA's underlying goal—protection of the educational opportunities for the handicapped—contains a fundamental tension. 886 F.Supp. at 1423. On the one hand, the IDEA expresses a preference for short statutes of limitation since the interests of the student are best served by the prompt resolution of educational disputes. *Id.* Simultaneously, however, the IDEA also encourages cooperation and negotiation among parents and school officials, a goal that is potentially undermined by abbreviated limitation periods. *Id.* The Court is convinced that use of a two-year limitation in the present matter will both safeguard the handicapped's educational rights and reconcile this tension. Under a two-year approach, a student and family seeking compensatory education for a period in which benefits were denied will have a substantial amount of time during which they can vindicate their rights through the administrative hearing process. At the same time, a two-year limitation will be long enough to provide incentives for non-adversarial negotiation and compromise, yet sufficiently short so as to insure finality and closure within a reasonable time. Accordingly, the Court holds that § 55–2–12(b) governs Stacey Leake's § 1415(b)(2) request.

■ Having determined the appropriate statute of limitation to apply, the Court must now decide when the contested claim accrued. Federal law determines the question of when a federal cause of action accrues. *Richards v. Fairfax County School Bd.*, 798 F.Supp. 338, 340 (E.D.Va.1992) (citation omitted) *aff'd,* 7 F.3d 225 (4th Cir.1993) (unpublished table decision). As explained in *Richards:*

> The general rule under federal law is that [IDEA] claims 'accrue when the parents know of the injury or the event that is the basis for their claim.' (citation omitted). The cause of action accrues when the plaintiffs learn of the injury, 'whether or not they [know] the injury [is] actionable.' (citation omitted).

*Id.* at 340–41.

■ In the present matter, as set forth above,[5] Ms. Shreve was notified that Stacey had been referred for special education testing, and gave consent thereto, in May 1986. Ms. Shreve later received and signed an Educational Plan form, dated November 12, 1986, which indicated both that her daughter would continue regular classes and that the PAC would reconvene at the end of the semester. In November and December 1987, Stacey was subjected to further classroom observation and testing, but the PAC did not meet again to consider her status. Stacey subsequently received, except possibly during the 1990–1991 academic year, regular education. Ms. Shreve did not herself initiate an effort to obtain special education services for Stacey until October and November 1993. In February 1994, the IEP Committee determined that Stacey did not qualify for special education but thereafter, in June 1994, found her eligible.

The foregoing demonstrates that Ms. Shreve was aware in November 1986 that Stacey had been denied special education services. In addition, as the Shreves' second Due Process Hearing request letter demonstrates, this allegedly improper denial is the event which gave rise to their claim for compensatory education. Thus, regardless of any procedural violations the school district may have committed prior, or subsequent, to

5. *See supra* note 1.

this determination,[6] it is clear that the plaintiffs' claim accrued at that time. Given this fact, the claim for compensatory education from the fall of 1986 to the fall of 1993, filed in October 1994, was untimely under the applicable two-year statute of limitations. The Hearing Officer, therefore, did not err in holding this claim to be time-barred.

## V. *Conclusion*

Under Fed.R.Civ.P. 56(c), summary judgment is appropriate if the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Pursuant to this standard, and for the reasons stated herein, the Court grants defendants' motion for summary judgment on the statute of limitations issue.

IT IS SO ORDERED.

---

**6.** Plaintiffs contend that the school system, between 1986 and 1994, committed various violations of Policy 2419's provisions. The Court, however, need not pass on these claims. Indeed, whatever their merits, these arguments do not effect the statute of limitations-accrual analysis since Ms. Shreve was aware of her daughter's eligibility status in November 1986 and continued to have this knowledge during the entire period—from the fall of 1986 to the fall of 1993—for which Hearing Officer Casey denied compensatory education.